Paul Kim (Ga. Bar No. 418841)
kimpau@sec.gov
M. Graham Loomis (Ga. Bar No. 457868)
loomism@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

950 E. Paces Ferry Road, Suite 900
Atlanta, GA 30326
(404) 842-7600 (Telephone)
4048427679@fax.sec.gov (Facsimile)

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>Edwin Emmett Lickiss, Jr.,<br><br>    Defendant. | Case No.<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

## SUMMARY OF THE ACTION

1. From at least 1998 through 2024, Defendant Edwin Emmett Lickiss, Jr. ("Defendant" or "Lickiss") engaged in a Ponzi-scheme selling millions of dollars worth of fraudulent promissory notes purportedly paying interest rates of between 9 and 32 percent to dozens of investors. Such fraudulent sales included at least $12.7 million in promissory note investments from approximately 80 investors between approximately 2018 and August 2024.

2. While the precise nature of Lickiss' statements to investors varied, to many of them he represented that, through their investment in the promissory notes, their monies would directly

or indirectly be invested in limited opportunity, high-yield government bonds or other investment opportunities from which they would profit.

3. Lickiss' representations were knowingly false when made. Bank records reflecting the invested proceeds show that Lickiss used the majority of investor funds to make Ponzi payments to other note investors or to pay for his personal expenses. Indeed, it appears that most, if not all, of the investment proceeds were never invested as he represented, but simply were stolen by him or misused to keep his scheme afloat.

4. Through his misconduct, Lickiss violated Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

5. With this action, the SEC seeks permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, and civil monetary penalties.

**JURISDICTION AND VENUE**

6. The SEC brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8. Lickiss, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint, including but not limited to, the use of the telephone and text messages.

9. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. During the relevant time periods, Lickiss has been, and continues to be, a resident of Danville, California. Additionally, acts, transactions, practices, and courses of business that form the basis of the

violations alleged in this complaint occurred in this District, including but not limited to, phone calls and text messages that occurred within this District.

**DIVISIONAL ASSIGNMENT**

10. Under Civil Local Rule 3-2(d), this civil action should be assigned to the Oakland Division because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in Contra Costa County, California.

**DEFENDANT AND RELEVANT ENTITIES**

11. Defendant **Edwin Emmett Lickiss, Jr.**, 77, has been and is a resident of Danville, California. He was a registered representative at various registered broker-dealers from September 1987 until in or about July 2014 when he was suspended by the Financial Industry Regulatory Authority ("FINRA") for failing to disclose tax liens on his Form U4 filed with FINRA and voluntarily terminated his association with his then employing registered broker-dealer, where he had been a registered representative since 1996.

12. **Foundation Financial Group** ("FFG") was a d/b/a under which Lickiss perpetrated his fraud, including but not limited to, using a bank account in its and Lickiss' name for investor deposits, Ponzi payments, and to pay personal expenses.

**FACTUAL ALLEGATIONS**

**A.    Background**

13. Between August 1996 and August 2014, Lickiss was a registered representative of a SEC registered broker-dealer. From at least 1998 through April 2024, Lickiss worked under the d/b/a FFG from an office space in Alamo, California (the "Alamo office").

14. In 2014, Lickiss was discovered to have failed to disclose on his FINRA Forms U4 at least four tax liens filed against him by the Internal Revenue Service ("IRS") and the State of California.

15. On certain of these Forms U4, Lickiss also affirmatively misrepresented that he was not subject to any liens filed against his assets or income.

16. Due to these disclosure failures and misrepresentations, on July 30, 2014, FINRA suspended Lickiss for four months. Prior to that suspension becoming effective, Lickiss voluntarily terminated his association with his then employing registered broker-dealer.

17. At that time, Lickiss purportedly "retired" from the securities business and sold his book of business.

18. Between August 2014 and 2024, despite claiming he was retired, Lickiss continued working from the same Alamo office.

19. Lickiss also used the same FFG letterhead that he had used previously, describing himself on stationery as "General Securities Principal" or, later, "Founder."

**B.    The Scheme**

20. Between 1998 and approximately August 2024, Lickiss fraudulently offered and sold to dozens of investors millions of dollars worth of fraudulent promissory notes, which purported to pay interest rates of between 9 and 32 percent per annum. Between approximately 2018 and August 2024, Lickiss received check deposits of approximately $11.2 million from approximately 80 investors from the sales of the fraudulent promissory notes, with an additional $1.5 million in cash deposits, upon information and belief, also coming from the sale of such promissory notes.

21. Further, within the past five years alone, Lickiss fraudulently obtained approximately $5.7 million from 40 investors from the sale of the fraudulent promissory notes.

22. Throughout the entire course of his scheme, Lickiss' representations in his offer and sale of the fraudulent promissory notes included that:

    a. note proceeds would be invested in high-yield government bonds issued in the 1960s and 1970s;

    b. investors in the fraudulent promissory notes would earn a return from the interest paid on these high-yield government bonds;

    c. these bonds were available only to a few select brokers, including himself;

    d. due to a special arrangement with the IRS, the proceeds and interest from the bonds would be tax-free to the investors in the promissory notes;

e. alternatively, he would invest the proceeds in high-yield investment opportunities to which he had special access and the promissory note holders would profit from the returns on the high-yield investment opportunities; and

f. the interest amounts to be paid on the notes would come from returns on the investments.

23. Further, throughout the entire course of his scheme, the promissory notes Lickiss offered to investors were typically one-page sheets, signed by him and on the letterhead of FFG.

24. The notes typically promised monthly interest payments and included a future date by which repayment of principal was supposed to occur.

25. Lickiss made periodic interest payments to certain investors, some of whom were repaid in full.

26. Lickiss convinced other investors, however, to roll over their interest payments into principal and new investments in promissory notes.

27. Lickiss also solicited additional investment money from existing investors, occasionally advising them to liquidate other investments to put more money into the notes.

28. On most occasions, when an investor invested more money, typically at a higher promised interest rate than earlier investments, the investor received a new note whose language reflected the cumulative amount of their total note investment as well as the interest rates supposedly being earned by each tranche of money the investor had given Lickiss.

29. When Lickiss solicited these offerings to potential investors, he did so in person, on the phone, or in text messages.

30. Contrary to his representations and unbeknownst to investors, Lickiss used the majority of these investor funds for Ponzi payments back to earlier investors or for his personal expenses.

31. By way of example, in July 2020, at a time when all of Lickiss' bank accounts had an aggregate starting balance of $22,549, Lickiss received investor funds of $375,500. As shown by the bank records, Lickiss proceeded to use those investor monies as follows: (a) making payments to other investors of $291,322; (b) making payments towards personal credit cards of

$95,301; (c) making a $10,077 mortgage payment and a $1,277 auto payment; (d) paying Disney Vacation Club Dues; (e) paying for utilities and maintenance on his personal home; (f) paying personal insurance premiums; and (g) giving his adult daughter $3,484.

32. As a result of these disbursements, Lickiss' ending monthly balance reflected on the bank records was less than $10,000.

33. By way of further example, one married couple - who became brokerage customers of Lickiss in the mid-1980s and told Lickiss they wanted to start a non-profit - were induced by Lickiss in or about 2015 to invest in a purported exclusive investment opportunity in high-interest government bonds to which Lickiss claimed he had special access because he had been "over-taxed" by the IRS.

34. Lickiss represented that the bonds paid a guaranteed rate of return of between 12 and 15 percent interest per year, which interest could be paid monthly, but which he advised should be rolled over.

35. Lickiss further stated that the investment was safe and guaranteed because the bonds were issued by the United States government. He also claimed that the couple could redeem their investment at any time, and they would not have to pay taxes on the investment because Lickiss had a sizeable tax credit with the IRS.

36. Based on these representations, in 2015, the couple invested $30,000 in Lickiss' securities offering and received in return a promissory note with a signature guarantee that Lickiss explained would make sure they received a full recovery of their investment should something happen to him.

37. Over the next seven years, the couple made nearly fifty separate investments in Lickiss' promissory notes via checks totaling $1,051,000. On some occasions, they transferred their invested amounts to Lickiss with checks that he deposited into his FFG account. On other occasions, Lickiss instructed the couple to hand-deliver and deposit into his bank the invested amounts in cash. With each new investment, the couple received from Lickiss a new promissory note recording their investment and stating the interest amount being earned thereon.

38. Contrary to Lickiss' representations, as shown by the bank records, the couple's investment monies were used primarily to pay personal expenses of Lickiss or make Ponzi payments to other investors.

39. In one instance, the couple invested $60,000 on December 30, 2020, by check deposit into Lickiss' FFG account. Prior to the deposit, the FFG account had a zero balance. Over the next four days, Lickiss used the entirety of that investment to make Ponzi payments of $40,346 and pay personal credit card debt of $27,121, thereby creating an overdraft transfer on one of his credit cards. By the beginning of January 2021, the FFG account once again had a zero balance.

40. In 2022, the couple requested withdrawals or redemptions of the notes to pay for cancer treatments for one of them. Lickiss responded with a myriad of excuses on why he could not return their money and eventually stopped communicating with them.

41. Over the course of the fraud, the couple received less than $30,000 in return on their "investments."

42. By way of further example, a different couple who first met Lickiss in 1998 approached Lickiss for advice on how to invest their $80,000 in proceeds from the sale of their home.

43. Lickiss represented to them that he had a "lucrative investment in bonds" that offered a rate of return between 12% and 15% a year, was risk-free, and was tax-free until they made a withdrawal.

44. Based on Lickiss' representations, the couple invested in the bonds and received in return a promissory note.

45. Over the years, the couple (and later just the widow) continued to make additional investments totaling at least $210,000 in Lickiss' notes - with Lickiss making the same type of misrepresentations about the nature and return to be obtained from these fraudulent notes.

46. Reiterating his earlier misrepresentations, Lickiss convinced the couple (and later the widow) not to take their promised interest payments and instead roll them over to increase their principal. Further, at various times, when the widow needed funds, Lickiss convinced her to withdraw money from a different and unrelated brokerage account, explaining that they should

leave their money invested in the promissory notes since the rate of return was higher than their brokerage account.

47. As with other investors, the invested funds were not used for the promised investments, but instead used to cover Lickiss' payments to other investors, including the misappropriation and misused of a $25,000 investment made by the widow on March 6 and 7, 2023.

48. Lickiss' misappropriated and misused their invested funds despite knowing that the couple had earmarked those funds to support their disabled son who has Down Syndrome.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

49. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 48.

50. Lickiss, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, and acting with scienter:

    a. Employed devices, schemes, or artifices to defraud;

    b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

51. By reason of the foregoing, Lickiss violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

## SECOND CLAIM FOR RELIEF

*Violations of Section 17(a) of the Securities Act*

52. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 48.

53. Lickiss, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a. with scienter, employed devices, schemes, or artifices to defraud;

    b. obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

54. By reason of the foregoing, Lickiss violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Permanently enjoin Lickiss from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### II.

Permanently enjoin Lickiss from directly or indirectly (including, but not limited to, through any entity owned or controlled by him) participating in the issuance, purchase, offer, or sale of any security provided however, that such injunction shall not prevent Lickiss from purchasing or selling securities for his own personal account.

**III.**

Permanently enjoin Lickiss from directly or indirectly acting as or being associated with any broker or dealer.

**IV.**

Order Lickiss to disgorge all ill-gotten gains received as a result of his unlawful conduct plus prejudgment interest thereon pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

**V.**

Order Lickiss to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just, equitable, and necessary.

The SEC hereby demands a trial by jury on all issues triable of right.

Dated: July 21, 2025

Respectfully submitted,

*/s/ M. Graham Loomis*
M. Graham Loomis
Paul Kim
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION